<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CATHY HARTNEY, JENNIFER ROMOLO, KRISTIN JOHNSON, ASHLEY LEVERNEZ, DEBRA FLASKA, PRATIBHA PRINCE, ASHLEIGH BOHLMAN, and VINCENTA WOLFE, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ZOETIS, INC., <br><br> Defendant. | Civil Action No. 24-09698 (SDW) (AME) <br><br> **OPINION** <br><br> July 22, 2026 |

**WIGENTON**, District Judge.

Before this Court is Defendant Zoetis, Inc.'s ("Defendant") Motion to Dismiss Plaintiffs' Fourth Amended Class Action Complaint (D.E. 46 ("FAC")) pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(6). (D.E. 50 ("Motion").) Jurisdiction is proper pursuant to 28 U.S.C. §§ 1332(d)(2)-(6) and 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b). This Court considers this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated herein, Defendant's Motion is **GRANTED**, and the Fourth Amended Complaint is hereby **DISMISSED WITH PREJUDICE**.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This putative class action arises from the administration of Librela, a monoclonal antibody marketed by Defendant for the control of osteoarthritis-related pain in dogs. Eight named Plaintiffs bring claims on behalf of themselves and a proposed nationwide class, alleging that Defendant

misrepresented Librela's safety, failed to warn veterinarians and pet owners about severe adverse events, and breached various statutory and common-law duties.  Plaintiffs' causes of action include failure-to-warn, design defect, breach of implied warranties, consumer fraud violations under several state statutes, and negligence.

### A.  Factual History[1]

#### a.  Librela and Reported Adverse Events

Librela is a long-acting canine monoclonal antibody (Bedinvetmab) administered by monthly injection for the management of osteoarthritis in dogs.  (FAC ¶¶ 1–2.)  According to the FAC, thousands of adverse events have been reported following Librela injections, including neurological injuries such as ataxia, convulsions, and proprioception abnormalities; musculoskeletal injuries such as lameness, muscle tremors, and paresis; hepatic and pancreatic injuries characterized by elevated liver enzymes or pancreatitis; and death.  (*Id.* ¶ 1.)  There is no antidote for the drug once administered.  (*Id.* ¶ 2.)

Plaintiffs allege that Defendant mislead consumers and prescribing veterinarians about these dangers by affirmatively misrepresenting Librela as being safe for dogs.  (*Id.* ¶ 3.)  Plaintiffs assert that the product's warning label, as well as advertising and promotional materials, including direct-to-consumer marketing, contained false and misleading statements and failed to adequately warn that Librela could cause the adverse events described above.  (*Id.* ¶ 4.)  According to Plaintiffs, veterinarians throughout the United States, including those who prescribed or administered Librela to Plaintiffs' pets,  relied on such alleged misrepresentations and informed Plaintiffs and members of the class that Librela was safe for its intended use and carried the risk

---

[1] The facts set forth in this section are drawn from the Fourth Amended Complaint and are presumed true solely for purposes of this Motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

of only minor side effects.  (*Id.* ¶¶ 5–6.)  Specifically, the FAC states that Defendant's marketing campaign for Librela, which centered around the slogan "More Days of Play," led consumers and veterinarians to believe that the product was safe and effective for its intended use.  (*Id.* ¶¶ 7–9.)

Defendant allegedly continued to tout Librela's safety even after an FDA-mandated label change in January 2025, which added certain warnings. (*Id.* ¶ 14.)  Plaintiffs further allege that adequate warnings would have altered both veterinarians' prescribing decisions and pet owners' consent, and that Defendant's misrepresentations caused them to purchase Librela injections they otherwise would not have.  (*Id.* ¶¶ 18–19.)  The cumulative effect of these misrepresentations has allegedly resulted in millions of dollars in costs for pet owners, including the price of the injections, veterinary expenses, and in some cases the loss of their dogs.  (*Id.* ¶ 22.)

> b.  *Allegations of the Named Plaintiffs*

The FAC details the experiences of eight named plaintiffs from various states. (*See generally id.* ¶¶ 23–118.)  On or around May 16, 2024, Cathy Hartney, a resident of Florida, consented to a Librela injection for her dog Jake.  (*Id.* ¶ 24.)  Prior to the administration of Librela to Jake, Plaintiff Hartney's veterinarian informed Plaintiff that Librela was safe for use in dogs and had no known risks of significant side effects or adverse reactions.  (*Id.* ¶ 25.)  Relying on her veterinarian's representations, which Plaintiffs allege were based on Librela's labeling, marketing and promotional materials, Plaintiff Hartney consented to having Librela administered to her dog. (*Id.* ¶¶ 25–26.)  Within days of the administration of Librela, Jake developed increased thirst, decreased appetite, limited mobility, and worsening pain; he ultimately had to be euthanized.  (*Id.* ¶¶ 29–30.)     Plaintiff Hartney alleges that she spent money on the injection and subsequent veterinary care and would not have consented to Librela had she known the risks.  (*Id.* ¶¶ 28–34.)

On or around May 23, 2024, Jennifer Romolo, an Illinois resident, consented to a Librela

injection for her dog Blue. (*Id.* ¶ 36.) She similarly alleges that, prior to the administration of Librela to Blue, she relied on her veterinarian's representations that Librela was safe for use in dogs, which were based on Librela's labeling, marketing and promotional materials. (*Id.* ¶¶ 37–38.) After the injection, Blue experienced decreased appetite, increased thirst, vomiting, lethargy, anemia, and a rash. (*Id.* ¶ 41.) Plaintiff Romolo contends that she incurred veterinary expenses and emotional distress and would not have chosen Librela if Defendant had not represented that Librela was safe and effective for use in dogs. (*Id.* ¶¶ 39–45.)

From February 2024 through September 2024, Kristin Johnson, a resident of Texas, administered Librela to her two golden retrievers, Dixie and Jack, over several months. (*Id.* ¶ 47.) Likewise, she alleges that she relied on her veterinarian's representations that Librela was safe for use in dogs and had no known risks of significant side effects or adverse reactions. (*Id.* ¶¶ 48–49.) She contends that one dog developed deafness and bowel control issues and the other suffered ataxia, hind leg weakness, and growths. (*Id.* ¶¶ 52–53.) Despite treatment, Jack ultimately died. (*Id.* ¶ 54.) Plaintiff Johnson asserts that she paid for multiple injections, incurred veterinary costs, and endured emotional anguish. (*Id.* ¶¶ 55–58.)

From December 2023 through February 2024, Ashley Levernez, another Texas resident, claims that her Australian shepherd Maisley developed inappetence, increased pain, muscle atrophy, ataxia, and eventually hind leg paralysis following Librela injections. (*Id.* ¶¶ 59–65.) She alleges that despite treatment, Maisley's condition deteriorated, and she was ultimately euthanized. (*Id.* ¶ 66.) As a result, Plaintiff Levernez incurred significant medical expenses and suffered extreme emotional distress. (*Id.* ¶¶ 67–70.)

The FAC contains analogous narratives for the remaining Plaintiffs — Debra Flaska of California, Pratibha Prince of Missouri, Ashleigh Bohlmann of Virginia, and Vincenta Wolfe of

New Jersey — all of whom allege that they relied on their veterinarian's representations, which were based on Defendant's representations, consented to Librela injections, and later witnessed their dogs suffer severe adverse events. (*Id.* ¶¶ 71–118.) Each Plaintiff contends that adequate warnings would have prevented their consent and that they incurred economic losses and emotional harm as a result. (*Id.*)

### c. Marketing and Regulatory History

Dogs, like humans, suffer from a range of diseases, including osteoarthritis, which is the most common canine joint disease. (*Id.* ¶¶ 136–137.) Librela is a monoclonal antibody therapy designed to block nerve growth factor ("NGF"), a protein associated with pain transmission. (*Id.* ¶ 138.) It was approved in the European Union in November 2020 and in the United States in May 2023. (*Id.* ¶ 139.) Plaintiffs allege that since its U.S. approval, the FDA has received more than 10,000 reports of adverse events related to Librela, which were all transmitted to Defendant. (*Id.* ¶ 140.) According to Plaintiffs, Defendant concealed the harmful effects of Librela by altering or reclassifying adverse event reports to downgrade or mischaracterize "serious" adverse events as "non-serious." (*Id.* ¶ 141.) Adverse effects described by consumers include ataxia, convulsion, lameness, muscle tremor, muscle weakness, paresis, proprioception abnormality, recumbency, other neurological and musculoskeletal events, liver and pancreatic problems, and death (*Id.* ¶ 143.)

Despite these adverse effects, Plaintiffs claim that Zoetis launched an extensive marketing campaign directing pet owners to ask their veterinarians about prescribing Librela and encouraging pet owners to look for signs of undiagnosed osteoarthritis. (*Id.* ¶¶ 145–146.) Librela was marketed directly to consumers through television, digital, and print advertising, as well as through targeted messaging to veterinarians. Specifically, Plaintiffs state that Librela initiated a marketing

campaign centered around the slogan "More Days of Play," which indicated that Librela would control dog osteoarthritis pain and help dogs be more active. (*Id.* ¶ 147.)  Plaintiffs contend this marketing campaign misrepresented Librela's safety profile and downplayed or omitted known risks.  The original Librela product label is further alleged to have been inadequate because it did not disclose the full scope of adverse events reported. (*Id.* ¶ 151.)

Since Librela's release, thousands of reports of serious adverse incidents have been submitted, and Plaintiffs allege the actual number of adverse events exceeds what has been formally reported. (*Id.* ¶¶ 152–153.)  On November 20, 2023, the FDA's Center for Veterinary Medicine issued a notification to Zoetis in response to the volume of reports concerning Librela. (*Id.* ¶ 154.)  On September 10, 2024, the FDA reported the results of its Standard Adverse Events Review of Librela, based on the reports of adverse events during the post-approval period from May 5, 2023, to March 31, 2024. (*Id.* ¶ 155.)  The FDA subsequently issued a "Dear Veterinarian" Warning Letter on December 16, 2024, informing veterinarians that they identified and analyzed ataxia, seizures, other neurologic signs, including but not limited to, paresis, recumbency, urinary incontinence; polyuria, and polydipsia, and in some cases, death (including euthanasia), as adverse events in dogs receiving Librela. (*Id.* ¶ 170.)  Additionally, the FDA required Zoetis to adopt a new warning label effective January 2025, which warns of neurological and other injuries. (*Id.* ¶ 171.)

### B.  Procedural History

Plaintiffs filed the initial complaint (D.E. 1) in this matter in October 2024.  They filed the First Amended Complaint (D.E. 18) on November 6, 2024, and the Second Amended Complaint upon stipulation on November 20, 2024. (D.E. 24.)  Then, the parties again stipulated to the filing of the Third Amended Complaint on March 14, 2025. (D.E. 35.)  Shortly thereafter, Defendant moved to dismiss the Third Amended Complaint and to strike the class allegations. (D.E. 39.)  On

October 15, 2025, this Court granted Defendant's motion and dismissed the Third Amended Complaint without prejudice.  (D.E. 44.)  Plaintiffs filed their Fourth Amended Complaint on November 11, 2025.  (D.E. 46.)  Defendant then filed this instant motion to dismiss.  (D.E. 50.) The parties timely completed briefing.

## II.   **LEGAL STANDARD**

An adequate complaint must be "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This Rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level . . . ."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (stating that Rule 8 "requires a 'showing,' rather than a blanket assertion, of an entitlement to relief").

In considering a motion to dismiss pursuant to Rule 12(b)(6), a district court must conduct a three-step analysis.  First, it must "tak[e] note of the elements a plaintiff must plead to state a claim."  *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (alteration in original) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).  Second, the court "disregard[s] threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements."  *Id.* (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)).  Third, the court assumes the veracity of all well-pleaded factual allegations, "constru[es] them in the light most favorable to the plaintiff, and draw[s] all reasonable inferences in the plaintiff's favor."  *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 328 (3d Cir. 2022).  "If, after completing this process, the complaint alleges 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' the necessary elements of a claim, then it

plausibly pleads a claim." *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 556). Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to "show[] that the pleader is entitled to relief" as required by Rule 8(a)(2). *Id.*

## III.   <u>DISCUSSION</u>

### A.  Count 1— New Jersey's Consumer Fraud Act

Count 1 of the FAC asserts a claim for violation of the New Jersey Consumer Fraud Act on behalf of a nationwide class. Plaintiffs allege that the NJCFA applies to both New Jersey and out-of-state consumers in this matter. This proposal raises choice-of-law concerns as the named Plaintiffs and putative class members come from many different states, not just New Jersey. Although Plaintiffs claim that it is premature for this Court to conduct a choice-of-law analysis, the Third Circuit and several courts in this District often make choice-of-law determinations at the motion to dismiss stage in consumer fraud actions. *See Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 255 n. 5 (3d Cir. 2010) ("We reject [plaintiff's] argument that the District Court erred in resolving the choice-of-law determination as to his statutory consumer fraud act claim at the motion to dismiss stage, rather than wait until the class certification stage"); *see also Serrano v. Campbell Soup Co.*, 773 F. Supp. 3d 127, 151 (D.N.J. 2025) (collecting cases). Specifically, courts in this District have resolved choice-of-law questions "on a motion to dismiss when the necessary facts are pled in the complaint." *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 445 (D.N.J. 2012). Here, this Court can decide choice-of-law now because Plaintiffs have pleaded enough

facts in the FAC that the Court accepts as true.[2]  *See id.* at 445–48; *see also Serrano*, 773 F. Supp. 3d at 152.

A federal court sitting in diversity jurisdiction must apply the forum state's choice-of-law rules.  *Curtiss-Wright Corp. v. Rodney Hunt Co.*, 1 F. Supp. 3d 277, 283 (D.N.J. 2014).  New Jersey has adopted the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws.  *P.V. v. Camp Jaycee*, 962 A.2d 453, 459–60 (N.J. 2008). This is a two-part test. First, the Court must determine whether the NJCFA conflicts with the consumer fraud statutes of the named Plaintiffs' home states.[3]  It does.  *See Gray v. BMW of N. Am., LLC*, 22 F. Supp. 3d 373, 380 (D.N.J. 2014) (explaining that the NJCFA materially conflicts with the consumer protection statutes of California, including the CLRA); *Skeen v. BMW of N. Am., LLC*, No. 13-1531, 2014 WL 283628, at *5 (D.N.J. Jan. 24, 2014) (holding that the ICFA conflicts with the NJCFA because Illinois requires "actual damage"); *Miller v. Samsung Elecs. Am., Inc.*, No. 14-4076, 2015 WL 3965608, at *5 (D.N.J. June 29, 2015) (stating that an actual conflict exists between the FDUTPA and the NJCFA because the FDUTPA only permits recovery of actual damages)[4]; *Spera v. Samsung Elecs. Am., Inc.*, No. 12-05412, 2014 WL 1334256, at *3 (D.N.J. Apr. 2, 2014) (finding that actual conflicts exist between the NJCFA and the MMPA); *Durso v. Samsung Elecs. Am., Inc.*, No. 12-5352, 2013 WL 5947005, at *7 (D.N.J. Nov. 6, 2013) (concluding that the NJCFA conflicts with

---

[2] Although the parties' motion papers do not conduct a choice-of-law analysis for this Court's review, they do provide the information necessary for this Court to perform its own analysis.

[3] This Court notes that Plaintiffs' alternatively pleads claims for violation of California's Consumers Legal Remedies Act ("CLRA") (Count 3), violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) (Count 4), violation of Missouri's Merchandising Practices Act (MMPA) (Count 5), violation of Texas's Deceptive Trade Practices–Consumer Protection Act (DTPA) (Count 6), and violation of Virginia's Consumer Protection Act (VCPA) (Count 7).  As such, the Court will consider the foregoing statutes for its choice-of-law analysis.

[4] As to Plaintiff Hartney, the comparable consumer fraud statute is Florida's Deceptive and Unfair Trade Practice Act ("FDUTPA") Fla. Stat. § 501.204(1).

the DTPA because the DTPA requires a showing of reliance); *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 294 (D.N.J. 2009) (stating that an actual conflict exists between NJCFA and VCPA).

Because those laws conflict, the Court now must determine what State has the "most significant relationship" to Plaintiffs' consumer fraud claims. *P.V. v. Camp Jaycee*, 962 A.2d 453, 461 (N.J. 2008). In consumer fraud actions, New Jersey courts look to factors in Section 148 of the Restatement (Second) of Conflict of Laws to determine what State has the most significant relationship. *Maniscalco v. Brother Intern. (USA) Corp.*, 709 F.3d 202, 207 (3d Cir. 2013). "Section 148 has two subsections: Section 148(1) applies when the defendant made the fraudulent representations in the same state in which the consumer relied on the representations, whereas Section 148(2) governs when the misrepresentations and the reliance occurred in different states." *Rapid Models & Prototypes, Inc. v. Innovated Sols.*, 71 F. Supp. 3d 492, 503 (D.N.J. 2014). If a defendant made the fraudulent representation in the same state the plaintiff received and relied on it, then there is a presumption the law of that state applies. Restatement (Second) Conflict of Laws § 148(1) (1971). If not, then courts must examine:

a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

b) the place where the plaintiff received the representations,

c) the place where the defendant made the representations,

d) the domicile, residence, nationality, place of incorporation and place of business of the parties,

e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

*Id.* § 148(2). With the exception of Plaintiff Wolfe, Plaintiffs received Librela injections for their dogs and relied on Defendant's supposed misrepresentations in their respective home state, not New Jersey. Additionally, Plaintiffs claim that the alleged fraudulent statements and omissions made to Plaintiffs in this case were submitted to the FDA from Defendant's headquarters in New Jersey. As such, Section 148(2) applies. *See Serrano v. Campbell Soup Co.*, 773 F. Supp. 3d 127, 153 (D.N.J. 2025); *see also Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691, 709 (D.N.J. 2011).

Here, when accepting all of the facts pleaded by Plaintiffs as true, the factors weigh in favor of applying the law of Plaintiffs' home states. Indeed, Section 148(2)(a), (b), (d), and (e) all point toward Plaintiffs' home states. Plaintiffs received and relied upon the alleged misrepresentations in their home states and Plaintiffs' dogs received Librela injections in their home states. Section 148(2)(f) does not apply because there is no contract here. Although Defendant is headquartered in New Jersey, Section 148(2)(d) still favors Plaintiffs' home states. In consumer fraud cases, a plaintiff's domicile and residence are more important than the defendant's similar contacts because "financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship." *Maniscalco*, 709 F.3d at 208 (quoting Restatement § 148 cmt. i). Lastly, Section 148(2)(c) favors New Jersey, but not enough to outweigh the other factors favoring Plaintiffs' home states. *Id.* at 208-09. Balancing all these factors in favor of Plaintiffs' home states against the fact that Defendants' headquarters are located in New Jersey, this Court finds that the law of each Plaintiff's home state has the "most significant relationship" to Plaintiffs' consumer fraud action.

Since this Court has determined that Plaintiffs' consumer fraud claims must be brought under their home states' laws, only New Jersey Plaintiffs may state an NJCFA claim. Thus, New

Jersey's choice-of-law principles prohibit the other named Plaintiffs from asserting a NJCFA claim. *See Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 451 (D.N.J. 2012). (dismissing NJCFA claim with prejudice after finding California has the most significant relationship to plaintiff's consumer fraud claims); *see also Feldman v. Mercedes-Benz USA, LLC*, No. 11-00984, 2012 WL 6596830, at *8 (D.N.J. Dec. 18, 2012) ("Because the law of each consumer's home state applies to their consumer fraud claims, the named Plaintiffs cannot invoke the NJCFA on behalf of themselves or the putative nationwide class."). Accordingly, Count 1 is dismissed.

### B. Counts 2-7 — Consumer Protection and Fraud Claims

Counts 2 through 7 of the FAC assert statutory consumer protection and statutory fraud claims on behalf of the named Plaintiffs and putative subclasses: violation of the NJCFA on behalf of a New Jersey subclass (Count 2), violation of California's Consumers Legal Remedies Act (Count 3), violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count 4), violation of Missouri's Merchandising Practices Act (Count 5), violation of Texas's Deceptive Trade Practices–Consumer Protection Act (Count 6), and violation of Virginia's Consumer Protection Act (Count 7). The above statutes generally require Plaintiffs to allege unlawful or deceptive conduct, actual reliance or causation, and some form of ascertainable loss or damages. *See, e.g., Sun Chemical Corp. v. Fike Corp.*, 235 A.3d 145 (N.J. 2020) (NJCFA requires unlawful conduct, an ascertainable loss, and a causal relationship); *Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191, 1201 (N.D. Cal. 2014) (CLRA requires an unlawful act, reliance, damages, and causation); *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 850 (Ill. 2005) (ICFA requires a deceptive act, intent that plaintiff rely on deception, actual damages, and causation); *Diesel v. Mariani Packing Co. Inc.*, Civ. No. 22-1368, 2024 WL 1674520, at *5 (E.D. Mo. Apr. 18, 2024) (2020 MMPA amendment requires showing reasonable person would rely on the

unlawful act to enter into transaction); *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996) (DTPA requires consumer status, deceptive conduct, and producing cause); *Snider v. Hostess Brands, LLC*, Civ. No. 20-516, 2021 WL 311871, at *2 (W.D. Va. Jan. 15, 2021) (VCPA requires reliance).

Defendant argues that Plaintiffs' consumer protection and fraud claims must be dismissed because Plaintiffs fail to adequately plead causation or reliance. Specifically, Defendant asserts that Plaintiffs fail to allege the specific representations expressed or relied upon by Plaintiffs' veterinarians and which representations Plaintiffs themselves relied upon. Plaintiffs counter that the FAC sufficiently identifies and describes the false and misleading statements made by Defendant in its "More Days of Play" marketing campaign and the product labeling, which Plaintiffs and their prescribing veterinarians relied upon.

Here, the FAC fails to establish causation or reliance. As this Court previously determined, Plaintiffs' FAC again sets forth generic assertions that fail to identify specific representations that were relied upon by their veterinarians or the named Plaintiffs. Plaintiffs fail to allege any specific facts that establish a connection between Defendant's representations and the alleged injury claimed. Beyond vague references to Defendant's marketing campaign, Plaintiffs have not alleged what representations their veterinarians relied upon or what their veterinarians communicated to them. Although Plaintiffs contend that they relied on Librela's labeling, the FAC fails to allege that they read the label and their decision to consent to Librela injections for their dogs were based on the product's labeling. Critically, other than generally alleging that Defendant's marketing campaign was misleading, Plaintiffs do not allege that they viewed any marketing statements or materials that informed their decision to consent to Librela injections for their dogs. Without this

13

information, Plaintiffs' allegations amount to mere legal conclusions that does not state a plausible claim upon which relief may be granted.

Based on the foregoing, this Court also finds that there likewise is insufficient detail pled about the who, what, where, and when of Defendant's purported misrepresentations to satisfy Rule 9(b)'s heightened pleading standard. *See Snowdy v. Mercedes-Benz USA, LLC*, No. 23-1681, 2024 WL 1366446, at *17 (D.N.J. Apr. 1, 2024) ("Plaintiffs cannot satisfy Rule 9(b)'s particularity requirement simply by referencing a representation made by [defendant] on its website, without providing any allegations as to what point—if ever—Plaintiffs were exposed to that statement."); *see also Hughes v. Panasonic Consumer Elecs. Co.*, No. 10-846, 2011 WL 2976839, at *12 (D.N.J. July 21, 2011) (holding that Plaintiff did "not allege the date, place, or time of this misrepresentation or otherwise inject ... precision and some measure of substantiation into plaintiffs' allegations of fraud" by merely alleging that defendant made a misrepresentation in its advertising).

Furthermore, to the extent that Plaintiffs allege that they or their veterinarians relied on Defendant's "More Days of Play" marketing campaign, this Court notes that the NJCFA distinguishes between actionable misrepresentations of fact and "puffery." *LS-NJ Port Imperial LLC v. A.O. Smith Water Prods. Co.*, No. 22-1687, 2022 WL 17547269, at *6 (D.N.J. Dec. 8, 2022); *see also Rodio v. Smith*, 587 A.2d 621, 624 (N.J. 1991) ("puffery" is not deemed to be a misrepresentation of fact actionable for fraud). "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993). "[S]tatements that can be categorized as 'puffery' or 'vague and ill-defined opinions' are not assurances of fact and thus do not constitute misrepresentations." *CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P.*, 940 F.Supp.2d 141, 159 (D.N.J. 2013)

14

(citation omitted); *accord Kuzian v. Electrolux Home Products, Inc.*, 937 F. Supp. 2d. 599, 615 (D.N.J. 2013) (advertising 'puffery' does not usually amount to an actionable misrepresentation"). "Puffery is distinguishable from misdescriptions or false representations of specific characteristics of a product" and "[a]s such, it is not actionable." *Castrol*, 987 F.2d at 945.

Under New Jersey law, statements of puffery are "simply ... not statements of fact." *Peruto v. TimberTech Ltd.*, 126 F. Supp. 3d 447, 457–58 (D.N.J. 2015) (citing *New Jersey Citizen Action v. Schering–Plough Corp.*, 842 A.2d 174, 177 (N.J. Super. App. Div. 2003)). Likewise, California's consumer protection statutes, Illinois CFA, Missouri's MPA[5], Texas's DTPA, and Virginia's CPA all recognize that puffery is non-actionable. *See Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1081 (N.D. Cal. 2017) ("Generalized, vague, and unspecified assertions constitute 'mere puffery' upon which a reasonable consumer could not rely and thus are not actionable...." (internal alterations and quotations omitted)); *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 926 (Ill. 2007) (dismissing Illinois CFA claim because the "representation is nothing more than puffery, and therefore is not a 'deceptive act' within the purview of the Act"); *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 163 (Tex. 1995) (stating that statements that are merely "puffing" or opinion does not constitute fraud and are not actionable under the DTPA); *Lambert v. Downtown Garage, Inc.*, 553 S.E.2d 714, 717 (Va. 2001)

---

[5] While the doctrine of puffery is found in Missouri's common law, it is not clear that the doctrine is applicable to claims under the MMPA. The Missouri Supreme Court has explicitly not addressed whether puffery can give rise to an MMPA claim. In *Hurst v. Nissan N. Am., Inc.*, 529 S.W.3d 322, 325 (Mo. 2017) (en banc), the Missouri Supreme Court stated that "[t]he question of whether 'puffery' is actionable under the MMPA, as opposed to the common law in which such statements generally are not actionable, is an interesting question worthy of study. But that question need not be decided in this case." However, federal courts have held that puffery is not actionable under the MMPA. *See Faltermeier v. FCA US LLC*, No. 15-00491, 2016 WL 4771100, at *7 (W.D. Mo. Sept. 13, 2016) (stating that a statement that amounts to puffery cannot serve as the basis for a claim under the MMPA"); *Wright v. Bath & Body Works Direct, Inc.*, No. 12-00099, 2012 WL 12088132, at *2 (W.D. Mo. Oct. 17, 2012) (same); *Williams v. United Techs. Corp.*, No. 15-04144, 2015 WL 7738370, at *8 (W.D. Mo. Nov. 30, 2015) (same). Although the issue is unresolved in Missouri, this Court will assume, for purposes of this motion only, that the doctrine of puffery does apply to an MMPA claim. *See Murphy v. Rigdon, Inc.*, No. 17-00556, 2018 WL 1005409, at *4 (W.D. Mo. Feb. 21, 2018) (applying doctrine of puffery to MMPA claim).

(acknowledging that commendatory statements, trade talk, or puffing, do not constitute fraud or violate the Virginia CPA). Here, the marketing statements identified by Plaintiffs, i.e., that Librela would make it easier for dogs to "move and play" and "improve overall quality of life," are mere puffery, which is not actionable under the applicable consumer protection statutes. Accordingly, Counts 2 through 7 are dismissed.

### C. Count 8 — New Jersey's Product Liability Act

#### i.  *Choice of Law Analysis*

Although this Court previously determined that it would not decide the choice-of-law question of whether the non-New Jersey Plaintiffs can bring an NJPLA claim at the pleadings stage, Plaintiffs have pled sufficient facts to allow this Court to do so. A federal court sitting in diversity jurisdiction must apply the forum state's choice-of-law rules. *Curtiss-Wright Corp. v. Rodney Hunt Co.*, 1 F. Supp. 3d 277, 283 (D.N.J. 2014). New Jersey has adopted the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws. *P.V. v. Camp Jaycee*, 962 A.2d 453, 459–60 (N.J. 2008). First, a court must determine whether a conflict actually exists between the potentially applicable laws. *Id.* If a conflict does exist, the court must determine which state has the most significant relationship to the claim at issue by weighing the factors in the applicable section of the Restatement (Second) of Conflict of Laws. *Id.*

Here, a clear conflict exists between the product liability laws of New Jersey and Plaintiffs' home states of California, Florida, Missouri, Texas, Illinois, and Virginia. New Jersey has enacted the NJPLA to codify its products liability law, allowing only one statutory cause of action for strict liability. *Torres v. Lucca's Bakery*, 487 F. Supp. 2d 507, 513 (D.N.J. 2007) (citing N. J. Stat. Ann. § 2A:58C–2 *and Green v. General Motors Corp.*, 709 A.2d 205, 209 (N.J. Super. App. Div. 1998)("Under the New Jersey Products Liability Act ... the causes of action for negligence, strict

16

liability and implied warranty have been consolidated into a single product liability cause of action, the essence of which is strict liability."). The NJPLA is the "sole basis of relief under New Jersey law available to consumers injured by a defective product." *Repola v. Morbark Industries, Inc.*, 934 F.2d 483, 492 (3d Cir. 1991). The NJPLA does not permit negligence or implied breach of warranty claims as separate claims for injuries caused by defective products. *Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 375 (D.N.J. 2019).

However, the states of California, Illinois, Florida, Texas, and Missouri permit plaintiffs to bring negligence or implied breach of warranty claims alongside strict product liability claims in the same action. *See Webb v. Special Elec. Co.*, 370 P.3d 1022, 1030 (Cal. 2016) (stating that California law permits product liability claims under both strict liability and negligence theories); *Gutterman v. Target Corp.*, 242 F. Supp. 3d 695, 704 (N.D. Ill. 2017) ("Under Illinois law, a plaintiff can bring a claim that a product is defectively designed through causes of action in both negligence and strict products liability."); *Small v. Amgen, Inc.*, 134 F. Supp. 3d 1358, 1366 (M.D. Fla. 2015), *aff'd*, 723 F. App'x 722 (11th Cir. 2018) (stating that Florida tort law provides that the manufacturer of a defective product may be subject to liability under both negligence and strict liability theories); *Romo v. Ford Motor Co.*, 798 F. Supp. 2d 798, 805 (S.D. Tex. 2011) ("Under Texas law, a plaintiff can recover in a products liability action under three theories: (1) strict liability; (2) negligence; and (3) breach of warranty."); *Sandage v. Bankhead Enters., Inc.*, 177 F.3d 670, 673 (8th Cir. 1999) (stating that under Missouri law, a products liability claim can be framed in strict liability, negligence, or breach of warranty theories). Additionally, unlike New Jersey, Virginia has not adopted a strict liability regime for products liability. *Evans v. Nacco Materials Handling Grp., Inc.*, 810 S.E.2d 462, 469 (Va. 2018); *see also Higgins v. Forest Lab'ys*, 48 F. Supp. 3d 878, 883 (W.D. Va. 2014) ("Under Virginia law ... manufacturers and sellers of

17

defective products can be held liable on theories of negligence and breach of the implied warranty of merchantability") (internal citation omitted).  Thus, this Court concludes that a conflict exists between the product liability laws of New Jersey and Plaintiffs' home states of California, Florida, Missouri, Texas, Illinois, and Virginia.  *See Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 375 (D.N.J. 2019) ("When two states authorize different causes of action arising out of the same set of facts, a conflict exists between the laws of the two states.").

Next, this Court must consider whether New Jersey has the most significant relationship to Plaintiffs' product liability claims.  *P.V. v. Camp Jaycee*, 962 A.2d 453, 461 (N.J. 2008).  In making this determination, the Court must look to a number of factors: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  *Id.* at 375–76 (citing Restatement (Second) of Conflict of Laws § 145 (1988)).

Here, the injury, i.e., the Librela injections, occurred in Plaintiffs' home states.  Plaintiffs went to veterinarians in their home states, and their dogs were prescribed Librela in their home states.  Any purported representations or warnings to Plaintiffs by Defendant were received in their home states.  Defendant's sole contact with New Jersey is the fact that Plaintiffs allege that Defendant is headquartered in New Jersey.  Plaintiffs attempt to expand the importance of this contact by alleging that supposed misrepresentations and omissions emanated from Defendant's headquarters in New Jersey.  However, this connection to New Jersey is tenuous and not sufficient enough to justify the conclusion that New Jersey has the most significant relationship to Plaintiffs' claims.  *See Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 376 (D.N.J. 2019) ("New Jersey has a tenuous connection to the harm caused to [plaintiff] and therefore has little interest in having its

18

products liability law enforced to protect the rights and interests of a non-resident."). Accordingly, only New Jersey Plaintiffs may state an NJPLA claim.

ii.     *Subsumption Under the NJPLA*

Defendant contends that Plaintiff Wolfe's NJCFA, negligence, and breach of the implied warranty claims are subsumed under the NJPLA. "[T]he NJPLA generally subsumes common law product liability claims, thus establishing itself as the sole basis of relief under New Jersey law available to consumers injured by a defective product." *Repola v. Morbark Indus., Inc.*, 934 F.2d 483, 492 (3d Cir. 1991). "If a claim is premised upon a product's manufacturing, warning, or design defect, that claim must be brought under the PLA." *Sun Chem. Corp. v. Fike Corp.*, 235 A.3d 145, 155 (N.J. 2020).

The NJPLA defines "harm" as: "(a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph." N.J.S.A. § 2A:58C-1(b)(2). Furthermore, a "product liability action" is defined as "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J.S.A. § 2A:58C-1(b)(3). Based on these provisions, courts have concluded that a claim is subsumed by the NJPLA if: (1) it is brought by a claimant for harm caused by a product, regardless of the theory underlying the claim; and (2) the harm suffered if of a type listed in the definitional section. *Barrett v. Tri-Coast Pharmacy, Inc.*, 518 F. Supp. 3d 810, 824 (D.N.J. 2021) (citing *Hindermyer v. B. Braun Med. Inc.*, 419 F. Supp. 3d 809, 818 (D.N.J. 2019)).

Here, the factual allegations, as pled in the Complaint, demonstrate that Plaintiff Wolfe's claims arise out of the injuries her dog suffered as a result of receiving Librela injections, an allegedly defectively designed and manufactured product. While Plaintiff attempts to shoehorn her allegations into other causes of action, it is clear from the boilerplate allegations that her claims sound in products liability causes of action. For instance, Plaintiff Wolfe alleges that Defendant violated the NJCFA because "[c]ontrary to Defendant's warranties and representations that Librela was safe and suitable for its intended use, Librela is unsafe as designed, manufactured, marketed, and sold." (FAC ¶ 253.) Plaintiff Wolfe further alleges that "Defendant actively concealed the serious safety risks from consumers and prescribing veterinarians by failing to disclose the serious safety risks to consumers and prescribing veterinarians." (FAC ¶ 256.) As such, Plaintiff Wolfe's NJCFA claim is clearly a failure to warn and defective product claim, which is subsumed by the NJPLA. *See Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691, 703 (D.N.J. 2011) (finding plaintiffs NJCFA claim for "spot on" flea and tick product was subsumed under the NJPLA because "the issue underlying [p]laintiffs' claims is that the chemicals in [d]efendants' products are dangerous and caused physical damage to Plaintiffs' property, in the form of harm to their pets' health."); *see also Roncal v. Aurobindo Pharma USA*, Inc., No. 20-02643, 2022 WL 1237888, at *4 (D.N.J. April 27, 2022) (finding plaintiffs' claims "are based on theories that they were harmed by the failure to provide a warning, the deficiency of product warnings and information in reference materials, and the failure to disclose adverse events related to the product" and that since "each theory is predicated on a failure to warn" the claims were subsumed under the NJPLA). Likewise, Plaintiff Wolfe's negligence and breach of implied warranty claims are also based solely on Defendant's alleged manufacture, design, and sale of a defective product. (*See* FAC ¶¶ 449–492.) Therefore, based on the allegations, as pled, Plaintiff Wolfe has clearly asserted a "harm"

20

which falls within the broad reach of the NJPLA, and her negligence, implied warranty, and fraud-based claims are subsumed by that statute.

Accordingly, as to Plaintiff Wolfe and the putative New Jersey subclass, Counts 2, 9 and 10 are dismissed.

### iii.    NJPLA Claims for Product Liability

Having determined that only the New Jersey Plaintiffs may assert an NJPLA claim, this Court next addresses the merits of Plaintiffs' NJPLA claim.  To plead a prima facie case under the NJPLA, a plaintiff must show that: (1) the product was defective; (2) the defect existed when the product left the hands of the defendant; (3) the defect proximately caused injuries to the plaintiff; and (4) the injured plaintiff was a reasonably foreseeable user.  *Myrlak v. Port Auth. of New York & New Jersey*, 723 A.2d 45, 52 (N.J. 1999).  A product is deemed defective when "it is not reasonably fit, suitable, or safe for the ordinary or foreseeable purpose for which it is sold."  *Id.* This standard of liability can be established by demonstrating that there is: (1) a manufacturing defect; (2) a design defect; or (3) inadequate warnings or instructions.  *Kemly v. Werner Co.*, 151 F. Supp. 3d 496, 505 (D.N.J. 2015).  In their Complaint, it appears that Plaintiffs allege claims for design defect and failure to warn pursuant to the NJPLA.

### a.    Design Defect

Defendant contends that Plaintiffs' design defect claim must be dismissed because it is preempted by federal law and Plaintiffs fail to allege an alternative design.  To establish a prima facie case of design defect, the plaintiff must assert that the product could have been designed more safely and present, under a risk-utility analysis, the existence of an alternative design that is both practical and feasible.  *Mendez v. Shah*, 28 F. Supp. 3d 282, 297 (D.N.J. 2014).  A plaintiff may pursue a design defect claim by contending that its risks outweigh its harm, or that an

21

alternative design exists. *Id*. The risk utility analysis involves examination of seven factors,[6] however, "the issue upon which most claims will turn is proof by plaintiff of a reasonable alternative design[.]" *Gremo v. Bayer Corp.*, 469 F. Supp. 3d 240, 255 (D.N.J. 2020).

Here, Plaintiffs fail to sufficiently plead a feasible alternative design. The FAC suffers from the same bare and conclusory allegations this Court previously dismissed. Instead of identifying the existence of an alternative design that is both practical and feasible, Plaintiffs simply allege that "[u]pon information and belief, safer, feasible, and practical alternative treatments for canine osteoarthritis pain were available." (FAC ¶ 447.) Such allegations are insufficient to satisfy the pleading requirements of a defective design claim. *See Nelson v. Biogen Idec Inc.,* No. 12-7317, 2013 WL 1700918, at *1 (D.N.J. Apr. 19, 2013) (dismissing design defect claim because the conclusory allegation that "[a]t the time [the product] left the hands of Defendants, there were safer alternative designs that were economically and technologically feasible by the application of reasonable scientific knowledge" was insufficient to demonstrate the existence of a reasonable alternative design). It appears that Plaintiffs recognized this deficiency as they attempted to cure it in their briefs by arguing that Defendant has developed new, safer osteoarthritis therapies. However, it is "axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) (internal quotation and citation omitted). Accordingly, Plaintiffs' design defect claim is dismissed.

      *b.  Failure to Warn*

---

[6] *See Grier v. Cochran Western Corp.*, 705 A.2d 1262, 1269 n.4 (N.J. 1998) (listing the seven risk utility factors). This Court notes that Plaintiffs do not adequately plead any of these factors, but rather alleges, in a conclusory fashion, that the "risks associated with Librela . . . outweighed any purported benefits or utility of the product," and "Defendant could have designed, formulated and/or labeled Librela in a manner that reduced or avoided the unreasonable risks without impairing its utility." (FAC ¶ 447.)

As a threshold issue, the parties dispute whether the "learned intermediary doctrine" is applicable to this matter.  The NJPLA incorporates the "learned intermediary doctrine," by which a "pharmaceutical manufacturer generally fulfils its duty to warn the ultimate user of its prescription drug ... when it supplies physicians with adequate information about a drug's dangerous propensities." *Vicente v. DePuy Synthes Companies*, 570 F. Supp. 3d 232, 245 (D.N.J. 2021) (citing *Banner v. Hoffmann-La Roche Inc.*, 891 A.2d 1229, 1236 (N.J. Super. App. Div. 2006)).  Courts have recognized an exception to that doctrine "when a pharmaceutical company has advertised its drug directly to the consuming public." *Id.* (citing *Perez v. Wyeth Labs., Inc.*, 734 A.2d 1245, 1255 (N.J. 1999)).

Plaintiffs argue that the learned intermediary doctrine is inapplicable because Defendant failed to adequately warn veterinarians and consumers of the risks associated with the use of Librela.  Plaintiffs also allege that if the learned intermediary doctrine applies, then the direct-to-consumer exception applies due to Defendant's marketing campaign that misrepresented the safety of Librela.  Here, given that Plaintiffs have alleged that Librela's warnings were inadequate, this Court declines to determine whether the learned intermediary doctrine is applicable to this matter.[7] As courts in this District have recognized, the question of whether the learned intermediary doctrine applies cannot be resolved at the motion to dismiss stage where the sufficiency of the warning is challenged.  *See Gremo v. Bayer Corp.*, 469 F. Supp. 3d 240, 254 n.9 (D.N.J. 2020) ("[T]he resolution of whether the doctrine is applicable in this case, and if it is, whether it defeats Plaintiff's failure-to-warn claim, cannot be resolved through the instant motion to dismiss."); *Hindermyer v. B. Braun Med. Inc.*, 419 F. Supp. 3d 809, 828 n.4 (D.N.J. 2019) ("Determining

---

[7] This Court notes, however, that the direct-to-consumer exception would not apply.  Plaintiffs claim that Defendant marketed Librela directly to veterinarians and consumers, but Plaintiffs fail to allege, with specificity, that they viewed any marketing statements or materials that informed their decision to consent to Librela injections for their dogs.

23

whether a prescribing physician was given sufficient warning in connection with a defendant's medical product pursuant to the learned intermediary doctrine raises factual questions that generally cannot be resolved on an undeveloped record.") (citing *Adkins v. Bristol-Myers Squibb Co.*, No. 07-00901, 2009 WL 5216986, at *8 (D.N.J. Dec. 30, 2009) ("[T]he Court fails to see how a motion to dismiss could be granted based upon application of the learned intermediary doctrine, particularly when the issue of the adequacy of the warning is generally a question for the jury."); *compare with Jankowski v. Zydus Pharms. USA, Inc.*, No. 20-2458, 2022 WL 1748061, at *4 (D.N.J. May 31, 2022), *aff'd*, No. 22-2212, 2023 WL 4700651 (3d Cir. July 24, 2023) (applying learned intermediary doctrine at the motion to dismiss stage where Plaintiff did not allege that the warning label was inaccurate); *see also Kendall v. Hoffman-La Roche, Inc.*, 36 A.3d 541, 554 (N.J. 2012) (stating that for product liability purposes, the adequacy of a warning is generally a jury question).

Nevertheless, regardless of whether the learned intermediary doctrine applies to this matter, Plaintiffs still fail to sufficiently plead their failure to warn claim. The NJPLA provides that "the manufacturer ... shall not be liable for harm caused by a failure to warn if the product contains an adequate warning." N.J. Stat. Ann. § 2A:58C-4. An "adequate product warning" is defined as "one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product." *Id.* "A product warning or instruction that does not comport with this statutory requirement is defective." *Banner v. Hoffmann-La Roche Inc.*, 891 A.2d 1229, 1236 (N.J. Super. Ct. App. Div. 2006).

The NJPLA further provides that if a warning was approved by the FDA, then "a rebuttable presumption shall arise that the warning ... is adequate." *Id.* The presumption can be overcome

in three ways: (1) "a plaintiff can establish deliberate concealment or nondisclosure of after-acquired knowledge of harmful effects"; (2) "a plaintiff can demonstrate economically-driven manipulation of the post-market regulatory process"; and (3) "a plaintiff can prove by clear and convincing evidence that a manufacturer knew or should have known in the post-marketing phase that the drug warnings were inadequate based on the label warning updating requirements in 21 C.F.R. § 201.57(c), 21 C.F.R. § 314.70(c), or any other pertinent federal regulation." *In re Accutane Litig.*, 194 A.3d 503, 531 (N.J. 2018) (quotation marks and citations omitted). "For all practical purposes, absent deliberate concealment or nondisclosure of after-acquired knowledge of harmful effects, compliance with FDA standards should be virtually dispositive of such claims." *Perez v. Wyeth Labs., Inc.*, 734 A.2d 1245, 1259 (N.J. 1999)

Here, Plaintiffs argue that the FAC overcomes the FDA presumption of adequacy because Plaintiffs pled post-approval acquisition of safety information and Defendant's failure to disclose it. Specifically, Plaintiffs rely on adverse event reports submitted to the FDA and the January 2025 label change. However, this Court finds that Plaintiffs have not alleged sufficient facts to rebut the presumption of adequacy. There are no facts in the FAC that suggest that Defendant deliberately concealed or failed to disclose after-acquired knowledge of harmful effects, as the adverse event reports identified by Plaintiffs were publicly available. Accordingly, Plaintiffs' failure to warn claim is dismissed.

### D. Counts 9 and 10 — Breach of Implied Warranty and Negligence

Plaintiffs assert claims for breach of the implied warranty and negligence on behalf of a proposed nationwide class. Plaintiffs allege that New Jersey law is applicable because the elements of breach of the implied warranty and common law negligence are consistent across the Plaintiffs' home states, thus there is no conflict of laws. *See Cont'l Ins. Co. v. Honeywell Int'l, Inc.*,

188 A.3d 297, 311 (N.J. 2018) (stating that under New Jersey's choice-of-law rules, if no conflict exists, then the law of the forum state applies).  However, as previously discussed, under New Jersey law, the NJPLA subsumes implied warranty and negligence claims that are premised upon a product's manufacturing, warning, or design defect." *Sun Chem. Corp. v. Fike Corp.*, 235 A.3d 145, 155 (N.J. 2020).  Here, Plaintiffs fail to plead implied warranty and negligence claims that are independent of their products liability claim.  Therefore, under New Jersey law, such claims are subsumed by the NJPLA.

Accordingly, Counts 9 and 10 are dismissed.

### E.  Dismissal with Prejudice

Plaintiffs have amended their complaint four times, and this Court has now twice dismissed Plaintiffs' claims for failure to state a claim.  Plaintiffs, given four opportunities, have failed to cure the deficiencies of the original complaint.  The differences between the Third and Fourth Amended Complaints do not suggest that Plaintiffs are progressing in the direction of an actionable claim.  Accordingly, it appears that permitting them to amend for a fifth time would be futile.  Therefore, because amendment would be futile, the dismissal will be with prejudice.  *See Prudential Ins. Co. of Am. v. Bank of Am., Nat. Ass'n*, 14 F. Supp. 3d 591, 596 (D.N.J. 2014) ("Dismissal of a count in a complaint with prejudice is appropriate if amendment would be inequitable or futile.")

## IV.   CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is **GRANTED WITH PREJUDICE**.  An appropriate order follows.

/s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:  Clerk
cc:    André M. Espinosa, U.S.M.J.
       Parties